UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GOEBEL & COMPANY FURNITURE, )
LLC, et al., )
)
     Plaintiffs, )
)
vs. )     Case No. 4:22-cv-00036-AGF
)
CINCINNATI INSURANCE COMPANY, )
)
     Defendant. )

## MEMORANDUM AND ORDER

This breach of contract action for insurance coverage is before the Court on

Defendant Cincinnati Insurance Company's motion for partial summary judgment.[1]  ECF

No. 86.  For the reasons set forth below, the Court will grant Defendant's motion in part

and deny it in part.

## BACKGROUND

For the purpose of the motion before the Court, the facts as established by the

record are as follows.  At all relevant times, Plaintiffs were the owners of the premises,

structures, and real property located at 401 Withers Avenue, St. Louis, Missouri, 63147

---

[1]     Although Defendant does not label its motion as one for "partial" summary
judgment, it concedes that it "is not seeking summary judgment relating to the entirety of
[Counts III, V, and VII]," which are all breach of contract claims arising from denial of
coverage for roof damage.  Rather, Defendant is only seeking summary judgment on
those claims "to the extent they would include damages for damage to machinery, lost
profits, and lost customer contracts."  ECF No. 97 at 1-2.  Defendant is seeking summary
judgment on Count I (breach of contract arising from denial of coverage for a parking lot
hole) and Counts II, IV, VI, and VIII (all vexatious refusal claims) in their entirety.  The
Court will only address the facts necessary to resolve Defendant's motion.

("401 Withers").  Plaintiffs used this premises to engage in the business of manufacturing high-end custom furniture for sale to corporate offices.  On or about May 23, 2019, Plaintiffs entered into an insurance contract ("the Policy") with Defendant to provide coverage for their business premises.

**Parking Lot Hole**

On or about October 25, 2019, Plaintiffs observed a hole forming in the rear parking area of 401 Withers and promptly notified Defendant of this damage.  The hole was so deep that Plaintiffs' owner, Martin Goebel, poured 40 bags of concrete into it, and it still was not full.  *See* Def.'s Resp. to Pls.' SOF, ECF No. 98 at 6; *see also* Jan. 11, 2023 Goebel dep. ("Goebel dep. 1"), ECF No. 92-4 at 112:20-113:10.  Plaintiffs admit that they do not know the nature and origin of the hole, that they believed it was a sinkhole "because the ground was sinking," and that they never retained any expert to inspect or opine regarding the nature of the hole.  *See* Pls.' Resp. to Def.'s SOF, ECF No. 92 at 14-15; *see also* Goebel dep. 1, ECF No. 92-4 at 122:19-23.  However, Plaintiffs note that environmental studies have indicated that nothing was built on the site previously.  *See* Pls.' Resp. to Def.'s SOF, ECF No. 92 at 15; *see also* Goebel dep. 1, ECF No. 92-4 at 122:23-123:7.

On November 8, 2019, Plaintiffs opened a claim under the Policy for this parking lot hole.  On November 11, 2019, Defendant sent claims adjuster Benjamin Ellegood out to examine the hole.  Mr. Ellegood[2] was not trained in geology or in specifically

---

[2]     As another witness in this case has the same last name (Cheryl Ellegood), the Court will distinguish between the two using the prefixes "Mr." and "Ms."

distinguishing between caves and sinkhole collapses. However, he was trained in water sourcing and erosion to some extent. *See* Def.'s Resp. to Pls.' SOF, ECF No. 98 at 2; *see also* Mr. Ellegood dep., ECF No. 92-2 at 13:11-14:4. Mr. Ellegood measured the void and diameter of the hole and tried to note any water around it. He speculated that the cause of the hole was erosion. *See* Def.'s Resp. to Pls.' SOF, ECF No. 98 at 2; *see also* Mr. Ellegood dep., ECF No. 92-2 at 20:18-21:3.

On November 19, 2019, Mr. Ellegood made a note in his claim file stating: "There is a sink hole in the parking lot." *See* Def.'s Resp. to Pls.' SOF, ECF No. 98 at 4; *see also* Pl.'s Ex. 1, ECF No. 92-1 at 3. On that same page of the claim file, Mr. Ellegood noted his concern regarding whether coverage for the hole was excluded by an "earth movement exclusion" under the Policy, and Mr. Ellegood expressed this concern to Plaintiffs' insurance agent, noting that he would continue to examine coverage endorsements before making a final decision. Pl.'s Ex. 1, ECF No. 92-1 at 3.

After his initial inspection but prior to Defendant's final determination of coverage, Mr. Ellegood examined a map of sinkhole collapses in the St. Louis City area, including a GeoSTRAT Map, which showed no sinkhole collapses in the area. *See* Def.'s Resp. to Pls.' SOF, ECF No. 98 at 2-3; Mr. Ellegood dep., ECF No. ECF No. 92-2 at 41:9-21; Def.'s Ex. T, ECF No. 98-1. Defendant denied the claim for coverage regarding the parking lot hole on November 22, 2019. Plaintiffs thereafter disputed the denial.

In response, on February 4, 2020, Defendant employed an expert, professional engineer Daniel J. Barczykowski to examine the hole. Barczykowski initially concluded: "Based on the observed conditions in the field, it is not apparent what the probable cause

3

of the hole is.  Obviously the hole has formed as the result of surface water eroding soil from beneath the pavement at the location of the hole; however, it is not possible to determine where the eroded soil is going."  Pl.'s Ex. 3, ECF No. 92-3 at 2. Barczykowski further referenced that he had reviewed the "USGS Geologic Map for the Granite City Quadrangle which represents the City of St. Louis and the subject property," and found that "there are no sinkhole collapses at or adjacent to [401 Withers Ave]."  *Id*.

Next, Barczykowski stated that "[t]he hole may be the result of soil erosion into a broken underground pipe or tunnel. This portion of the City has been developed for well over 100 years and is likely underlain by buried pipes and possibly tunnels."  *Id.* at 3.  He therefore recommended "[i]n an effort to determine the possible presence of underground pipes, tunnels, or voids, [that a different firm] perform[] a geophysical survey which may include ground penetrating radar, conductivity, and/or resistivity surveys."  *Id.  See also* Def.'s Resp. to Pls.' SOF, ECF No. 98 at 5.  Defendant never conducted such a geophysical survey.

Defendant denied the claim for the parking lot hole again on March 18, 2020.

**Roof Damage**

Between May 2020 and March 2021, several storms struck the St. Louis Metropolitan area, carrying significant amounts of hail and wind.  Plaintiffs allege that, due to the hail and wind from these storms, large portions of the roof of 401 Withers were damaged and significant amounts of rainwater began to leak through the roof.  *See* Def.'s Resp. to Pls.' SOF, ECF No. 98 at 6-9.  Plaintiffs promptly contacted Defendant about the roof damage beginning in March of 2021.

On April 23, 2021, Plaintiffs opened a claim under the Policy for coverage related to this roof damage.  Plaintiffs engaged the services of Nick Hennessey of Rehab Construction to assist with the roof damage claim.  *Id.* at 9.  Hennessey believed that both the upper and lower roofing structures of 401 Withers needed replacing.  *Id.*  On or about April 30, 2021, Defendant's adjuster, Cheryl Ellegood, coordinated an inspection of the roofing structures and advised Plaintiffs that Defendant had a policy requiring corporate headquarter approval for claims that exceeded $100,000; Plaintiffs interpreted Ms. Ellegood's comment as her encouraging Plaintiffs to keep the claim value under $100,000.  *Id.* at 10-11; *see also*, Hennessey dep., ECF No. 92-6 at 44:5-18.  Hennessey estimated the roofing repair would cost $288,161.12.  Def.'s Resp. to Pls.' SOF, ECF No. 98 at 11.  Ms. Ellegood, by contrast, prepared an estimate of $35,210.48 to repair the upper roof only.  *Id.*  When Hennessey attempted to get his much higher estimate approved by Defendant, Ms. Ellegood responded "Upper roof only."  *Id.* at 12.

Plaintiffs thereafter retained the services of Josh Volker of Storm Shield to assist with the roofing claim.  Volker inspected the roof and submitted an estimate to replace both the upper and lower roofs for $639,842.97.  *Id.* at 13-14.  Plaintiffs' roofing expert, Dan Cupid, also found that substantial damage to both the upper and lower roofs had been caused by the storms in 2021.  *Id.* at 15.

Defendant then retained Brandon Bealmear from HAAG Engineering to inspect the roof, and in September of 2021, Bealmear determined that the lower roof at 401 Withers had not sustained any hail or wind related damage, and that the leaks through the roof envelope were chronic and predated the storms in spring of 2021.  *Id.* at 15.  After

Bealmear found no covered cause of loss with respect to the lower roof damage, Defendant denied coverage for the lower roof.  *Id.* at 19.

Plaintiffs also filed additional claims with Defendant for storm damage alleged to have taken place in the summer of 2023.  *Id.* at 15.  Plaintiffs retained a licensed professional engineer, Chad Williams, to determine the nature and extent of the damage caused to the lower roof by the 2023 storms.  *Id.* Williams determined that the storms in the summer of 2023 had displaced the ceramic parapet caps, that water had entered the envelope of the lower roof, and that the roof must be totally replaced. *Id.* at 16. Defendant's expert, Bealmear, again inspected the roofs in connection with the 2023 roof damage claims and concluded that "further investigation [was] necessary" and "localized repairs should not be dismissed without more detailed analysis," but that there was no hail damage to the upper or lower roof and that wind damage was limited to the upper roof.  *Id.* at 16-17; *see also* Pl.'s Ex. 16, ECF No. 92-16 at 6; Def.'s Ex. P, ECF No. 88-16 at 2, 9; Def.'s Ex. Q, ECF No. 88-17 at 2, 9; Def.'s Ex. R, ECF No. 88-18 at  2, 9. Defendant paid Plaintiffs for the wind damage to the upper roof, which was part of the 2023 claims, in the amount of $20,206.73.  Pls.' Resp. to Def.'s SOF, ECF No. 92 at 20.

**<u>Machinery Damage</u>**

Plaintiffs allege that from the time of their initial claim of roof damage in 2021, they have also experienced water damage to their precision manufacturing machinery. Def.'s Resp. to Pls.' SOF, ECF No. 98 at 17.  Plaintiffs' owner, Goebel, has worked on the maintenance of the machines since the initial roofing claim was opened in 2021,

including purchasing the machines, taking them apart, removing rust, and conducting regular maintenance.  *Id.* at 18.

**Alleged Loss of Business Income**

Plaintiffs further allege that they spend time every day moving, tarping, and de-tarping production machines in order to avoid water damage, which shortens their production schedule.  Def.'s Resp. to Pls.' SOF, ECF No. 98 at 18.  Plaintiffs have not missed filling any orders due to these activities.  Nov. 15, 2024 Goebel dep. ("Goebel dep. 2), ECF No. 92-18 at 65:6-66:19; 100:3-10.  However, Plaintiffs allege that, due to the loss of production capacity, they have chosen not to bid on certain future projects for fear of being unable to meet production deadlines.  Def.'s Resp. to Pls.' SOF, ECF No. 98 at 18.

For example, Plaintiffs' owner, Goebel, testified that after a sale to Nike in January of 2020, he had informal conversations with Nike about future projects and informed Nike that Plaintiffs were unable to bid on future contracts because of possible penalties Nike would impose if Plaintiffs failed to deliver on time.[3]  Goebel further testified that Plaintiffs "stopped chasing" work similar to Nike because they believed they would not be able to fulfill future similar contracts.  Goebel dep. 2, ECF No. 92-18 at 90:6-15, 98:24-99:7.

---

[3]     Plaintiffs have no documents reflecting this conversation or showing that Plaintiffs informed Nike that the could not bid on future contracts.  Goebel dep. 2, ECF No. 92-18 at 90:20-91:12.

However, Goebel admitted that Plaintiffs do not know what Nike's internal selection process for new contracts may be, and that, at the time of the above-noted informal conversations with Nike, Nike had not placed any order or request for a quote with Plaintiffs relating to any upcoming projects *Id*. at, 92:3-93:1; 93:23- 94:13, 96:10-16. Goebel further admitted that Plaintiffs have not turned down any specific requests for work in the three years prior to 2024 due to a lack of production capacity. *Id*. at 98:10-99:7; 100:3-10.

**Policy Terms**

The relevant provisions of the Policy are as follows:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM (INCLUDING SPECIAL CAUSES OF LOSS)**

* * *

**SECTION A. COVERAGE**

We will pay for direct "loss" to Covered Property at the "premises" caused by or resulting from any Covered Cause of Loss.

  **1.**    **Covered Property**

Covered Property, as used in this Coverage Part, means the following types of property for which a Limit of Insurance is shown in the Declarations:

* * *

**3.**    **Covered Causes of Loss**

 **a. Covered Causes of Loss**

Covered Causes of Loss means direct "loss" unless the "loss" is excluded or limited in this Coverage Part.

**b. Exclusions**

(1) We will not pay for "loss" caused directly or indirectly by any of the following, unless otherwise provided. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

* * *

**(b) Earth Movement**

* * *

4) Earth sinking (other than "sinkhole collapse"), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

* * *

This Earth Movement exclusion applies regardless of whether any of the above, in paragraphs 1) through 5), is caused by an act of nature or is otherwise caused.

* * *

**(g) Water**

* * *

4) Water under the ground surface pressing on, or flowing or seeping through:

a) Foundations, walls, floors or paved surfaces;

b) Basements, whether paved or not; or

c) Doors, windows or other openings.

* * *

**SECTION G. DEFINITIONS**

 * * *

16. "Sinkhole collapse" means the sudden settlement or collapse of earth supporting the Covered Property into subterranean voids created by the action of water on a limestone or similar rock formation. This does not include:

a. The cost of filling sinkhole collapses;

b. Sinking or collapse of land into man-made subterranean cavities; or

 c. The value of the land.

* * *

9

**CINCIPLUS COMMERCIAL PROPERTY POWER XC+ (EXPANDED COVERAGE PLUS) ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY COVERAGE PART**

The insurance coverage and Limits of Insurance provided by this endorsement are excess of, and apply in addition to, any similar or identical coverage provided by any other endorsement attached to this Coverage Part, or by any other Coverage Part forming a part of the policy of insurance of which this Coverage Part forms a component.

\* \* \*

**S. Paved Surfaces**

 For the purposes of this endorsement only:

1.     **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 2. Property Not Covered, i. Paved Surfaces** is deleted in its entirety and replaced by the following:

Except as provided **in 4. Additional Coverages, Paved Surfaces**, bridges, roadways, walks, patios or other paved surfaces.

2.     **BUILDING AND PERSONAL PROPERTY COVERAGE FORM, SECTION A. COVERAGE, 4. Additional Coverages** is amended to include the following:

**Paved Surfaces**

We will pay for direct "loss" resulting from any of the Covered Causes of Loss to bridges, roadways, walks, patios or other paved surfaces.

 The most we will pay for loss in any one occurrence under this Paved Surfaces Coverage Extension is $25,000.

 \* \* \*

*See* Pls.' Resp. to Def.'s SOF, ECF No. 92 at 2-7, 13; *see also* Def.'s Ex. B, ECF

No. 88-2 at 26-30, 61-62, 82, 90; Def.'s Ex. C, ECF No. 88-3 at 30-34, 65-66, 81,

89; Def.'s Ex. D, ECF No. 88-4 at 31-35, 66-67, 82, 90).[4]

---

[4]     The Policy contained nearly identical provisions within a Builders' Risk Inland Marine Coverage form, but that coverage form was canceled prior to 2021. *See* Pls.' Resp. to Def.'s SOF, ECF No. 92 at 7-9, 13.

The Policy further provided as follows with respect to loss payments:

**SECTION D. LOSS CONDITIONS**

The following conditions apply in addition to the **COMMON POLICY CONDITIONS** and the **COMMERCIAL PROPERTY CONDITIONS.**

* * *

**4. <u>Loss Payment</u>**

a. In the event of "loss" insured by this Coverage Part, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms **of SECTION D. LOSS CONDITIONS, 7. Valuation** or any applicable provision that amends or supersedes this valuation condition.

* * *

**7. Valuation**

We will determine the value of Covered Property in the event of direct "loss" as follows:

a.        At "Actual Cash Value" as of the time of direct "loss" . . . .

* * *

---

11

### SECTION F. OPTIONAL COVERAGES

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

\* \* \*

### 3.  Replacement Cost

a.    Replacement Cost (without deduction for depreciation) replaces "Actual Cash Value" in **SECTION D. LOSS CONDITIONS, 7. Valuation** of this **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**.

\* \* \*

c.    You may make a claim for "loss" covered by this insurance on an "Actual Cash Value" basis instead of on a replacement cost basis. In the event you elect to have "loss" settled on an "Actual Cash Value" basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the "loss".

\* \* \*

e.    We will not pay more for "loss" on a replacement cost basis than the least of:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace, on the same "premises", the lost or damaged property with other property:

      (a)    Of comparable material and quality; and

      (b)    Used for the same purpose; or

(3) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

\* \* \*

12

**SECTION G. DEFINITIONS**

1. "Actual cash value" means replacement cost less a deduction that reflects depreciation, age, condition and obsolescence.

 * * *

*See* Pls.' Resp. to Def.'s SOF, ECF No. 92 at 11-13; *see also* Def.'s Ex. B, ECF No. 88-2 at. 53-54, 57, 59-61; Def.'s Ex. C, ECF No. 88-3 at 57-58, 61, 63-65; Def.'s Ex. D, ECF No. 88-4 at 58-59, 62, 64-66.

**<u>Current Lawsuit</u>**

As a result of the above events, Plaintiffs filed suit in state court for breach of contract and vexatious refusal to pay.  Defendant removed the case to this Court on diversity grounds.[5]  The operative complaint (ECF No. 63) asserts eight counts: (I) breach of contract arising from denial of Plaintiffs' October 25, 2019 parking lot hole claim and (II) vexatious refusal to pay that claim; (III) breach of contract arising from denial of Plaintiffs' March 11, 2021 roofing damage claim and (IV) vexatious refusal to pay that claim; (V) breach of contract arising from the denial of Plaintiffs' July 1, 2023

---

[5]     Although neither the complaint nor the notice of removal properly pleads the citizenship of Plaintiffs, both of which are limited liability companies, the Court has reviewed Plaintiffs' disclosure statements, filed pursuant to Federal Rule of Civil Procedure 7.1 and this Court's Local Rules.  These disclosure statements (ECF Nos. 34 & 35) confirm that Plaintiffs are Missouri citizens and therefore diverse from Defendant, an Ohio citizen.  *See GMAC Commercial Credit LLC v. Dillard Dep't Stores, Inc*., 357 F.3d 827, 829 (8th Cir. 2004) (holding that a limited liability company is a citizen of every state of which any member is a citizen).  Before the case was transferred to the undersigned, the Court also dismissed a non-diverse and resident Defendant, Cheryl Ellegood, as fraudulently joined.  ECF No. 15. Finally, there is no dispute that the amount in controversy exceeds $75,000.  For these reasons, the Court is satisfied that it has diversity jurisdiction over this action under 28 U.S.C. § 1332.

roofing damage claim and (VI) vexatious refusal to pay that claim; (VII) breach of contract arising from the denial of Plaintiffs' July 29, 2023 roofing damage claim and (VIII) vexatious refusal to pay that claim.

In its motion for partial summary judgment, Defendant argues Plaintiffs' claims related to the parking lot hole (Counts I and II) fail because the Earth Movement exclusion applies and because Plaintiffs have failed to present expert or other evidence from which a jury could reasonably conclude the hole was a "sinkhole collapse" (as that term is defined under the Policy) so as to avoid the exclusion.

Next, Defendant argues that summary judgment is warranted in part on the contract claims for roof damage (Counts III, V, and VII), only to the extent that Plaintiffs are seeking recovery for (a) damage to machinery because Plaintiffs have failed to name any expert to testify regarding the same; (b) lost profits because there is no coverage for lost profits under the Policy; and (c) lost customer contracts because these alleged damages are too remote and speculative.

Finally, Defendant argues that summary judgment is warranted on Plaintiffs' remaining vexatious refusal claims (Counts IV, VI, and VIII) because Defendant relied on its experts and because the existence of hail or wind damage to the roofing structures is an open question of fact, such that Defendant should not be penalized for insisting upon a judicial determination.

## **DISCUSSION**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

14

Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, a court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the record.  *Sokol & Assocs., Inc. v. Techsonic Indus., Inc.*, 495 F.3d 605, 610 (8th Cir. 2007) (citations omitted).

"Interpretation of an insurance policy is a matter of state law."  *Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010) (citation omitted).  "The provisions of an insurance policy are read in the context of the policy as a whole."  *Columbia Mut. Ins. Co. v. Shauf*, 967 S.W.2d 74, 77 (Mo. 1998) (citation omitted).  When deciding matters governed by state law, federal courts sitting in diversity are bound by the decisions of the state's highest court, and "[w]here no Missouri Supreme Court precedent exists on an issue, we predict what that court would decide and consider intermediate appellate court decisions in that process."  *Am. Family Mut. Ins. Co., S.I. v. Mid-Am. Grain Distribs., LLC*, 958 F.3d 748, 751–52 (8th Cir. 2020) (citation omitted).

In Missouri, the burden of proof is on the insurer to show an exclusion clause applies.  *Lexington Ins. Co. v. Integrity Land Title Co.* 852 F.Supp.2d 1119, 1131–32 (E.D.Mo. 2012) *aff'd*, 721 F.3d 958 (8th Cir.2013).  Although exclusion clauses are to be strictly construed against the insurer, the Missouri Supreme Court has stated that "where language in an insurance contract is unequivocal, it is to be given its plain meaning notwithstanding the fact that it appears in a restrictive provision of a policy."  *Cawthon v. State Farm Fire & Cas. Co.,* 965 F. Supp. 1262, 1264 (W.D. Mo. 1997) (quoting *Harrison v. MFA Mut. Ins. Co.,* 607 S.W.2d 137, 142 (Mo. 1980)).

15

**Parking Lot Hole Coverage (Counts I and II)**

Upon careful consideration, the Court agrees that Defendant has established as a matter of law that the Earth Movement exclusion applies to preclude coverage for the parking lot hole and that there is no evidence from which a jury could reasonably conclude that the hole was a "sinkhole collapse" as that term is defined under the Policy, so as to avoid the exclusion.

As noted above, the Policy contains an Earth Movement exclusion that excludes loss caused directly or indirectly by "[e]arth sinking (other than 'sinkhole collapse collapse'), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty."  *See, e.g.*, Def.'s Ex. D, ECF No. 88-4 at 33-34.  "Soil conditions" include "erosion . . . and the action of water under the ground surface."  *Id.* at 34.  Likewise, the Policy contains a Water exclusion that excludes losses caused by "[w]ater under the ground surface pressing on, or flowing or seeping through … [f]oundations, walls, floors or paved surfaces . . . ."  *Id.* at 35.

As noted above, the professional engineer retained by Defendant, Barczykowski, examined the hole in February of 2020 and concluded "the hole has formed as the result of surface water eroding soil . . . ."  Pl.'s Ex. 3, ECF No. 92-3 at 2.   Barczykowski further reviewed the USGS Geologic Map for the Granite City Quadrangle which represents the City of St. Louis and the subject property and found no indications of any sinkhole collapses at or adjacent to the property.[6]  *Id.*  Based upon these findings, the

---

[6]     Plaintiffs rely heavily on the fact that Defendant never conducted Barczykowski's recommended geophysical survey.  But the record does not indicate that such a survey

16

parking lot hole fell squarely within the Earth Movement exclusion such that coverage was properly denied.

Indeed, Plaintiffs do not appear to dispute that, unless the parking lot hole was a "sinkhole collapse," the Earth Movement exclusion would apply to preclude coverage. Plaintiffs' entire argument for coverage with respect to the parking lot hole is that the hole is a "sinkhole collapse" as defined under the Policy and therefore an exception to the Earth Movement exclusion.

But Plaintiffs have admitted that they do not know the nature or origin of the hole and that they referred to it as a "sinkhole collapse" simply because the ground was sinking and environmental studies had indicated that nothing was previously built on the site. *See* Goebel dep., ECF No. 92-4 at 122:19-123:7. The definition of a "sinkhole collapse" under the Policy is highly technical and not within the comprehension of laypersons. And under Missouri law, which applies here, "[e]xpert testimony is needed to establish [points that are] beyond the purview of the ordinary lay witnesses." *Luscombe v. Mo. State Bd. of Nursing*, No. WD75049, 2013 WL 68899, at *11 (Mo. Ct. App. Jan. 8, 2013); *see also Taylor v. Cont. Freighters, Inc.*, 315 S.W.3d 379, 382 (Mo. Ct. App. 2010) (holding that expert testimony is required when proof of causation is highly technical and not within the realm of lay understanding).

---

would have been relevant to the question of whether the hole was due to a sinkhole collapse. Rather, Barczykowski recommended the survey to "determine the possible presence of underground pipes, tunnels, or voids . . ." *See* Pl.'s Ex. 3, ECF No. 92-3.

For this reason, causation opinions involving earth movements are routinely provided by experts.  *See, e.g.*, *Midwest Fam. Mut. Ins. Co. v. Hari Om Rudra Hotel, LLC*, 416 F. Supp. 3d 853, 864-66  (W.D. Mo. 2019) (denying coverage for water damage under similarly-worded earth movement exclusion where the insured failed to proffer expert testimony on the source of the water damage that contradicted the insurer's conclusion); *Kunce v. State Farm Fire & Cas. Co.*, No. 18-06046-CV-W-FJG, 2019 WL 5653966, at *8-9 (W.D. Mo. Sept. 30, 2019) (relying on expert testimony to determine applicability of an earth movement policy exclusion); *see also Dupps v. Travelers Ins. Co.*, 80 F.3d 312, 314 (8th Cir. 1996) (rejecting an insured's attempt to avoid an earth movement exclusion by arguing that the speculative possibility of a sinkhole collapse "presents a factual question for a jury").  As other federal courts interpreting similar state laws regarding insurance coverage have held, "causation opinions involving earth movements are . . . are based on scientific or specialized knowledge and not the product of reasoning processes familiar to the average person in everyday life," and therefore require expert testimony.  *See Hogan v. Rose*, No. 716CV1325BKSATB, 2022 WL 675703, at *9 (N.D.N.Y. Mar. 7, 2022) (collecting cases).

The only evidence Plaintiffs offer in support of a finding that the hole was a "sinkhole collapse" is: (1) the testimony of Plaintiffs' owner, Goebel, that the hole was so deep that 40 bags of concrete could not fill it, and (2) a single note in insurance adjuster Mr. Ellegood's claim file, dated November 19, 2019, stating: "There is a sinkhole collapse in the parking lot."  Pl.'s Ex. 1, ECF No. 92-1 at 3.

But no reasonable jury could conclude from this evidence alone that the parking lot hole was a "sinkhole collapse."  As to Mr. Ellegood's note, on the same page of the claim file, Mr. Ellegood also noted his concern that coverage may be excluded by the Earth Movement exclusion under the Policy, Mr. Ellegood expressed this concern to Plaintiffs' insurance agent, and Mr. Ellegood noted that he would continue to examine coverage endorsements before making a final decision.  Mr. Ellegood's stray reference to a "sinkhole"—made before further inspections by Defendants' agents revealed no indications of sinkhole collapses adjacent to the property and that, instead, the hole was due to surface water eroding soil—is insufficient to permit a jury to find that the hole was caused by a "sinkhole collapse" as that term is defined under the Policy.

The same is true for Goebel's testimony regarding the number of bags of concrete necessary to fill the hole.  Such testimony simply does not permit a jury to find that the hole was caused by "the sudden settlement or collapse of earth supporting the Covered Property into subterranean voids created by the action of water on a limestone or similar rock formation," as required under the Policy.  *See* Def.'s Ex. D, ECF No. 88-4 at 67.

For these reasons, coverage was properly denied on Plaintiffs' breach of contract claim regarding the parking lot hole (Count I), and the Court will grant summary judgment in favor of Defendant on this claim.  Further, because the underlying contract claim for the parking lot hole fails, Defendant cannot be liable for vexatious refusal to pay that claim.  *See, e.g.*, *Aziz v. Allstate Ins. Co.*, 875 F.3d 865, 869 (8th Cir. 2017) (holding under Missouri law that "[t]here can be no recovery for vexatious refusal where there is no judgment for the plaintiff on the insurance policy") (citing *State ex rel. U.S.*

19

*Fidelity & Guaranty Co. v. Walsh*, 540 S.W.2d 137, 141-42 (Mo. Ct. App. 1976)).

Therefore, the Court will also grant summary judgment for Defendant on Count II.

## Machinery Damage Related to Roofing Coverage Claims

Defendant argues that partial summary judgment is warranted on Plaintiffs'

remaining contract claims for roofing coverage (Counts III, V, and VII) to the extent

Plaintiffs seek to recover for damage to their machinery because Plaintiffs were required

to and have not proffered expert testimony to establish such damages.   Defendant

reasons that to recover for machinery damage, Plaintiffs must establish either the  "Actual

Cash Value" (i.e., replacement cost less a deduction that reflects depreciation, age,

condition and obsolescence) of the machinery, or the "Replacement Cost without

deduction for depreciation for any personal property" for the machinery; that such

testimony requires highly technical market valuations; and that, as such, an expert

witness is required under Federal Rules of Evidence 701 and 702.  *See* ECF No. 87 at 506

(quoting Policy).

The Court disagrees.  Unlike the highly technical subject of earth movement

causation opinions, the machinery repair costs and valuation here may be established by

the lay opinion testimony of Goebel.[7]  At this stage, Plaintiffs have established that

Goebel, as principal owner of the company, has experience purchasing, repairing, and

maintaining the machinery at issue.  His testimony about the estimated repair cost and

value of the machinery is therefore the type of testimony which traditionally may be

---

[7]      Defendants have not raised any issue with respect to the disclosure of Goebel's
anticipated opinion testimony under Federal Rule of Civil Procedure 26(a)(2).

admitted under Federal Rule of Evidence 701. *See, e.g., J. Lloyd Int'l, Inc. v. Super Wings Int'l, Ltd.*, No. 15-CV-74-LRR, 2016 WL 7411132, at *9 (N.D. Iowa Dec. 22, 2016) (holding that president and owner of company could provide lay opinion testimony as to damages associated with historical cost acquisition for tools used by company and as to the sale and scrap values of the tools, based on his experience).

Indeed, the Advisory Committee's notes to Rule 701 provide:

> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See, e.g.*, *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

Advisory Committee Notes to 2000 amendment to Fed. R. Evid. 701. *See also, e.g., Hot Stuff Foods, LLC v. Hous. Cas. Co.*, 771 F.3d 1071, 1079 (8th Cir. 2014) ("[W]e will not reverse a district court for admitting testimony by a business owner or officer regarding lost profits when his 'experience in the business provided the foundation for all the specifics to which he testified.'") (quoting *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 837 (8th Cir. 2005)); *Allied Sys., Ltd. v. Teamsters Auto. Transp. Chauffeurs*, 304 F.3d 785, 792 (8th Cir. 2002) (finding a business officer could render a lay opinion as to business value based on "particularized knowledge that the witness has by virtue of his or her position in the business").

In its reply brief, Defendant highlights potential weaknesses in Goebel's testimony, including the extent of his purchasing experience and market research. However, those weaknesses may be fully explored on cross examination. The Court will therefore deny Defendant's motion for partial summary judgment on the roofing coverage claims (Counts III, V, and VII) as they relate to machinery damage.

**Lost Profits and Customer Contracts Related to Roofing Coverage Claims**

Defendant next argues that the roofing coverage claims (Counts III, V, and VII) also fail in part to the extent that Plaintiffs seek lost profits or damages for lost customer contracts. Defendant argues that there is no coverage for lost profits under the terms of the Policy and that, in any event, Plaintiffs' claim for lost profits is based on alleged lost customer contracts that are too remote or speculative to recover. Plaintiffs respond that they are not seeking lost profits but rather coverage for "Loss of Business Income" due to the roofing damage from wind or hail, and "Extra Expense" that the Policy provides is "intended to pay an insured if a covered cause of loss damages their property and the insured takes on extra expenses to remain in business and offset the business income loss." ECF No. 91 at 7-8 (quoting Policy).

Regardless of whether these alleged damages are characterized as lost business income or lost profits, the same legal standard applies.[8] "The general rule under Missouri law is that anticipated profits of a commercial business are too remote and speculative to

---

[8]    Indeed, the parties both cite the same body of Missouri caselaw setting forth the legal standard for recovering lost profits. *Compare* Def.'s Br., ECF No. 87 at 8-9, *with* Pls.' Resp. Br., ECF No. 91 at 8.

warrant recovery," but that "anticipated profits can be recovered when they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount." *Wash Sols., Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 892–93 (8th Cir. 2005) (citing  *Tipton v. Mill Creek Gravel, Inc.,* 373 F.3d 913, 918-19 (8th Cir.2004) (interpreting Missouri law)); *see also Catroppa v. Metal Bldg. Supply, Inc*., 267 S.W.3d 812, 819 (Mo. Ct. App. 2008) (holding that lost profits must be demonstrated "with reasonable certainty and must rest upon more than mere speculation" to be recoverable under Missouri law) (quoting *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.,* 155 S.W.3d 50, 55 (Mo. 2005)).

Plaintiffs acknowledge that they do not have evidence of specific cancelled contracts and instead rely on their owner Goebel's testimony that he chose not to bid on certain contracts "for fear of being unable to meet production deadlines."  ECF No. 91 at 8-9.  Plaintiffs further argue that their prior project with Nike to furnish its corporate offices grossed $350,000.00, and Plaintiffs were listed as one of Nike's preferred global vendors.  *Id.* at 9.  But as noted above, Plaintiffs admit that they never turned down work during the relevant period due to a lack of production capacity, and that aside from informal conversations with Nike, they never had an order or request for quotes related to any future project with Nike.

Under such circumstances, the Court concludes that Plaintiffs' evidence regarding lost profits is precisely the type of speculation prohibited by Missouri courts. *See, e.g.*, *Tipton*, 373 F.3d at 919 ("Projecting $14 million in lost profits upon a future demand that does not yet exist is exactly the kind of conjectural assumption that is disfavored by all

23

Missouri courts that have addressed the issue of lost profits."); *see also Hillside Enters. v. Carlisle Corp.*, 69 F.3d 1410, 1414 (8th Cir. 1995) (holding under similar Ohio law that the district court properly excluded lost profits beyond a "firm order" because to assume the firm order "would have led to [other orders] is only speculative"); *cf. Catroppa*, 267 S.W.3d at 819 (holding that recovery for future lost ticket sales was appropriate where there was specific evidence "that the advance ticket price was $15 per ticket; that Respondent had sold 500 advance tickets; that the door or gate ticket price was $20 per ticket; and that 3 times advance ticket sales was a reasonable projection of the number of door or gate tickets that would have been sold had the concert not been cancelled").

Therefore, the Court will grant Defendant's motion for summary judgment on the roofing coverage claims (Counts III, V, and VII) only to the extent Plaintiffs seek damages for lost profits, lost business income, and lost customer contracts.

## Vexatious Refusal to Pay Roofing Damage Claims

Finally, Defendant moves for summary judgment on the remaining vexatious refusal claims (Counts IV, VI, and VIII) on the ground that there were open questions of fact regarding the existence of hail or wind damage to the roofing structures, and Defendant reasonably relied on its experts to deny the roofing damage claims.

"Missouri law [regarding vexatious refusal] provides that an insured may recover penalties and attorney fees when an insurer denies a claim without reasonable cause or excuse." *United Fire & Cas. Co. v. Historic Pres. Trust*, 265 F.3d 722, 729 (8th Cir. 2001); *see* Mo. Rev. Stat. §§ 375.296, 375.420. "These statutes are penal in nature and narrowly construed; their purpose is to deter the insurer from vexatiously refusing to pay

'after becoming aware it has no meritorious defense' to the insured's claim." *State of Missouri ex rel. Pemiscot Cnty., Mo. v. W. Sur. Co.*, 51 F.3d 170, 174 (8th Cir. 1995).

"To support a claim of vexatious refusal to pay proceeds of an insurance policy, the insured must show the insurer's refusal to pay is willful and without reasonable cause, as the facts would appear to a reasonable and prudent person." *Mears v. Columbia Mut. Ins. Co.*, 855 S.W.2d 389, 394 (Mo. Ct. App. 1993) (citation omitted). "When there is an open question of law or fact, the insurance company may insist upon a judicial determination of those questions without being penalized." *Watters v. Travel Guard Int'l*, 136 S.W.3d 100, 109 (Mo. Ct. App. 2004) (citations omitted). However, "the existence of a litigable issue, either factual or legal, does not preclude a vexatious penalty where there is evidence the insurer's attitude was vexatious and recalcitrant." *Acad. Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 780 (8th Cir. 2024) (interpreting Missouri law), *reh'g denied,* No. 23-1375, 2024 WL 4499662 (8th Cir. Oct. 16, 2024).

"To prove vexatious refusal to pay, the insured is not required to present direct and specific evidence." *JAM Inc. v. Nautilus Ins. Co.*, 128 S.W.3d 879, 898 (Mo. Ct. App. 2004) (quoting *DeWitt v. Am. Family Mut. Ins. Co.*, 667 S.W.2d 700, 710 (Mo. 1984)) "Instead, the jury may find that the refusal to pay was vexatious based 'upon a general survey and a consideration of the whole testimony and all the facts and circumstances in connection with the case.'" *JAM Inc*, 128 S.W.3d at 898 (quoting *DeWitt*, 667 S.W.2d at 710). "Generally, whether an insurer acted reasonably is a question of fact for the jury, and thus is improper for a court to determine in granting a summary judgment." *May & May Trucking, L.L.C. v. Progressive Nw. Ins. Co.*, 429 S.W.3d 511, 516 (Mo. Ct. App.

2014).  "However, in cases in which the underlying facts are undisputed, that question of fact becomes a question of law for the court to properly decide."  *Id.* at 516-17.

At this stage, the Court cannot resolve the remaining vexatious refusal claims as a matter of law.   While Defendant is entitled to insist on a judicial determination as to the cause and extent of the roofing damage, viewing the facts and all reasonable inferences in light most favorable to Plaintiffs (as this Court must), evidence exists from which a reasonable jury may conclude that Defendant's refusal to pay was vexatious and recalcitrant.  For example, a reasonable jury could draw this conclusion based on the timing and history of Defendant's expert inspections, when compared to Plaintiffs' hired experts' findings of hail and wind damage, as well as Defendant's own expert's conclusion that "further investigation [was] necessary" and that "localized repairs should not be dismissed without more detailed analysis."  Def.'s Resp. to Pls.' SOF, ECF No. 98 at 16-17.  *See, e.g.*, *Refrigeration Supplies, Inc. v. Acadia Ins. Co.*, 507 F. Supp. 3d 1096, 1105–06 (E.D. Mo. 2020) ("Given the timing, number and history of the inspections, when combined with reports from Acadia's own hired experts which found hail damage, a reasonable jury might well conclude that Acadia was simply unwilling to pay for the damage to RSI's roofs . . . .").  Although Defendant maintains that its investigation was reasonable, that does not render the issue undisputed.  Therefore, the Court will deny Defendant's motion for summary judgment on Counts IV, VI, and VIII.

## **CONCLUSION**

For the reasons set forth above,

26

**IT IS HEREBY ORDERED** that Defendant motion for summary judgment is **GRANTED in part and DENIED in part**, as set forth above.  ECF No. 86.  The motion is **GRANTED** as to Counts I and II in their entirety; and Counts III, V, and VII only to the extent they seek damages for lost profits, lost business income, and lost customer contracts.  The motion is otherwise **DENIED**.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of May, 2025.